## IN THE  UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GARFIELD REDD                                  )
Register Number 43395-037                      )
FCI Schuylkill                                 )
Interstate 81 & 901 W                          )
Minersville, Pennsylvania 17954                )
                                               )        Civil Action No.:
     Plaintiff,                             )
                                               )
    vs.                                     )
                                               )
PAUL C. SIEGRIST, Personal                     )
Representative of                              )
THE ESTATE OF SEAN M SUITER                    )
Serve On:                                      )
STONE, WILEY & LISENBACK, PC                   )
3 N. Baltimore Street                          )
Dillsburg, Pennsylvania 17019                  )
                                               )
and                                            )
                                               )
OFFICER PEDRO A. VARGAS, JR.                   )
INDIVIDUALLY AND IN OFFICIAL                   )
CAPACITY                                       )
Serve On:                                      )
MICHAEL HARRISON, Police                       )
Commissioner                                   )
601 E. Fayette Street                          )
Baltimore, Maryland 21202                      )
                                               )
and                                            )
                                               )
SERGEANT KENNETH E. IVERY                      )
INDIVIDUALLY AND IN OFFICIAL                   )
CAPACITY                                       )
Serve On:                                      )
MICHAEL HARRISON, Police                       )
Commissioner                                   )
601 E. Fayette Street                          )
Baltimore, Maryland 21202                      )
                                               )
and                                            )
                                               )
SERGEANT JAMES S. GLANVILLE                    )

INDIVIDUALLY AND IN OFFICIAL          )
CAPACITY                              )
Serve On:                            )
MICHAEL HARRISON, Police             )
Commissioner                         )
601 E. Fayette Street                )
Baltimore, Maryland 21202            )
                                     )
and                                  )
                                     )
ANTHONY W. BATTS, Former Police      )
Commissioner for Baltimore City,     )
Individually and in Official Capacity as  )
Commissioner                         )
601 E. Fayette Street                )
Baltimore, Maryland 21202            )
                                     )
and                                  )
                                     )
FREDERICK H. BEALEFELD, III,         )
Former Police Commissioner for       )
Baltimore City, Individually and in Official  )
Capacity as Commissioner             )
601 E. Fayette Street                )
Baltimore, Maryland 21202            )
                                     )
and                                  )
                                     )
LEONARD HAMM                         )
Former Police commissioner for       )
Baltimore City, Individually and in Official  )
Capacity as Commissioner             )
601 E. Fayette Street                )
Baltimore, Maryland 21202            )
                                     )
and                                  )
                                     )
BALTIMORE CITY POLICE                )
DEPARTMENT                           )
Serve On:                            )
MICHAEL HARRISON, Police             )
Commissioner                         )
601 E. Fayette Street                )
Baltimore, Maryland 21202            )
                                     )
and                                  )

2

| | |
|---|---|
| MAYOR & CITY COUNCIL OF | ) |
| BALTIMORE | ) |
| Serve On: | ) |
| DANA P. MOORE, Acting City Solicitor | ) |
| City Hall | ) |
| 100 N. Holliday Street, Room 101 | ) |
| Baltimore, Maryland 21202 | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

**NOW COMES PLAINTIFF**, Garfield Redd, by and through his attorneys, A. Dwight Petit, Latoya Francis-Williams, the Law Offices of A. Dwight Petit, P.A., Allan B. Rabineau, Matt R Ballenger, John R. Roche, and Ballenger & Roche, LLC, and sues the defendants, Paul C. Siegrist, Personal Representative of the Estate of Detective Sean M. Suiter, Sergeant Kenneth E. Ivery, Sergeant James S. Glanville, Officer Pedro A. Vargas,, Baltimore City Police Department, Anthony W. Bates, former Police Commissioner for Baltimore City Police Department, in his individual and official capacity as Police Commissioner for Baltimore City Police Department, Anthony W. Batts, former Police Commissioner for Baltimore City Police Department, in his individual and official capacity as Police Commissioner for Baltimore City Police Department, Anthony W. Batts, former Police Commissioner for Baltimore City Police Department, in his individual and official capacity as Police Commissioner for Baltimore City Police Department, Leonard Hamm, former Police Commissioner for Baltimore City Police Department, in his individual and official capacity as Police Commissioner for Baltimore City Police Department, and Mayor & City Council of Baltimore for reasons therefore states as follows:

### INTRODUCTION

1.  This is an action for money damages brought under the laws of the State of Maryland, the Constitution of the United States, and various applicable federal laws against Paul C.

Siegrist, Personal Representative of the Estate of Detective Sean M. Suiter (hereinafter "Detective Suiter" and/or "Defendant Officer"), Baltimore City Police Department Officers Sergeant Kenneth E. Ivery (hereinafter "Sergeant Ivery" and/or "Defendant Officer"), Sergeant James S. Glanville (hereinafter "Sergeant Glanville" and/or "Defendant Officer"), Officer Pedro A. Vargas (hereinafter "Officer Vargas" and/or "Defendant Officer"), Anthony W. Batts, former Police Commissioner for Baltimore City in his Individual and Official Capacity as Commissioner (hereinafter "Commissioner Batts" and/or "Defendant Commissioner"), Frederick H. Bealefeld III, former Police Commissioner for Baltimore City, in his individual and official Capacity as Commissioner of the Baltimore City Police Department (hereinafter "Commissioner Bealefeld" and/or "Defendant Commissioner"), Leonard Hamm, former Police Commissioner for Baltimore City, in his individual and official Capacity as Commissioner of the Baltimore City Police Department (hereinafter "Commissioner Hamm" and/or "Defendant Commissioner") and the Mayor and City Council of Baltimore City.

2. These claims arise out of the unlawful and tortious actions of members of the former "Flex Squad", which was an elite police unit which was subsequently rebranded as the Gun Trace Task Force (GTTF) in Baltimore City's Police Department whose members were both Caucasian and African American, as well as other Baltimore City Police Officers that had work-related ties to the GTTF Officers.

3. It is alleged that the individual Officers Suiter, Ivery, Vargas, and Glanville, made an unreasonable and unlawful arrest of Plaintiff, Garfield Redd (hereinafter "Mr. Redd" and/or "Plaintiff"), and falsely charged Mr. Redd with crimes, including possession of a

firearm and handgun on person, thereby violated his rights protected by the Maryland Declaration of Rights including, but not limited to, Article 24 and Article 26, as well as the United States Constitution including, but not limited to, the Fourth Amendment and Fourteenth Amendment.

4. It is further alleged that the defendant former Commissioners Leonard Hamm, Anthony Batts and Frederick H. Bealefeld, III, failed to properly train, supervise, manage, and otherwise enforce departmental policies and investigate/follow-up public complaints of malfeasance from other citizens of Baltimore City prior to and after the incident complained of in this case.

## PRE-SUIT REQUIREMENTS

5. Plaintiff has satisfied the notice claim prerequisites to suit as specified by the Maryland Tort Claims Act, Md. Code Ann., State Gov't Art., § 12-106, and the Local Government Tort Claims Act, Md. Code Ann., Cts. & Jud. Proc. Art., § 5-304. Plaintiff sent timely notices of his claims to the Baltimore City Solicitor, the Maryland State Treasurer, and the Baltimore City Police Department, by certified mail, return receipt requests.

## JURISDICTION AND VENUE

6. Jurisdiction is proper under 42 U.S.C. § 1331 and 42 U.S.C. § 1984, 1985, and 1988.

7. Venue is proper in the U.S. District Court for the District Court of Maryland (Northern District) under 28 U.S.C., § 1391 in that Plaintiff reside in the State of Maryland and all Defendant Officers have worked in the City of Baltimore at the time of the events alleged herein; their employer, the Baltimore City Police Department (hereinafter "BCPD"), is also located in Baltimore, Maryland. The actions complained of occurred in the City of Baltimore.

## PARTIES

8.  That at all times relevant hereto, Plaintiff Garfield Redd, is an African American Baltimore City Resident who was the victim of an unlawful arrest, prosecution and detention, and false charges.  Plaintiff Redd suffered emotional distress at the hands of the aforementioned Baltimore City Police Officers as a result of his arrest without legal justification and falsely charging him with numerous charges including possession of a firearm and handgun on person.  Plaintiff brings this action as a Baltimore City citizen who suffered constitutional depravations by Defendants.

9.  That at all times relevant hereto Defendant Officers were Baltimore City Police Department officers acting under color of State and local law, and upon information and belief, as members of the "flex squad" and/or with close work-related ties to it and are joined in this complaint in their individual and official capacity.

10. That at all times relevant hereto, all Defendant Officers were duly authorized agents, servants, and employees of the BCPD, and who without legal justification stopped Plaintiff Redd in an unlawful stop and, thereafter, arrested and falsely charged Mr. Redd.

11. That at all times relevant hereto, Defendant Commissioner Hamm, Commissioner Batts, and Commissioner Bealefeld were appointed by the Mayor of Baltimore under the advice and consent of the Baltimore City Council.  Said Commissioners, in their respective capacities as such, exercised final policy making authority for BCPD, established the duties, standards of conduct, and discipline of officers.  The Commissioners, in their respective capacities, established policies regarding hiring, screening, training, monitoring, supervision, and discipline of officers employed by the BCPD.

12. Much has been widely reported in the community, both prior to and subsequent to actions alleged herein, regarding allegations of illegal and tortious activities of members of the elite squads including specific Defendant BCPD officers in this lawsuit.  Said allegations have resulted in civil actions, some resulting in settlements and awards.   The commissioners were either aware of or should have been aware of these matters; therefore, had actual or constructive knowledge that BCPD officers were engaged in conduct posing a pervasive and unreasonable risk of actual harm and constitutional depravation to citizens such as Mr. Redd.  The commissioners' responses to the reports of illegal and tortious activities of the elite squads was so inadequate or nonexistent as to constitute deliberate indifference to or tacit authorization of the alleged offensive practices.  There was an affirmative causal link between the commissioners' inaction and Garfield Redd's injuries and constitutional deprivations.

13. At all times relevant herein, Defendant Mayor & City Council of Baltimore, was the governing authority of Baltimore City, which is categorized as a municipality in the State of Maryland empowered to carry out certain governmental functions within its geographic limits, and is the sole provider of financial support for the Baltimore City Police Department; therefore, it is in fact, the party responsible under the Local Tort Claims Act, Maryland Courts & Judicial Proceedings, Section 5-301 *et. seq.* for the actions and civil violations of the Baltimore Police Department.  Defendant Mayor & City Council was at all times relevant acting in control of the Baltimore City Police Department despite its repeated denials.  The Mayor & City Council at all times relevant to facts pertaining to this case exercised control over and influenced the policies, practices, and customs of the police department, as well as the training, supervision, control, and discipline of police officers.

14. The BCPD is, and was, the employer of Defendant Officers named herein.  In addition, the BCPD failed to act through its policy-making officials, including, but not limited to, the Mayor, members of the City Council, the Police Commissioner of BCPD, and other high ranking members of the BCPD, including colonels, majors, precinct captains, lieutenants, and sergeants engaged in supervision of police patrol activities; the act and edicts of these policy making officials constitute the policies, practices, and customs of Baltimore City. The Mayor & City Council controls, hires, fires, and directs the commissioner in these activities.  For years, the Mayor & City Council has been hiding behind the fallacy that the BCPD is controlled by the State.  That although historically conceived to get the control of the BCPD in State hands and not local control, this is no more than a relic of past history and is not factually supported at the present time, as the financial support for the BCPD comes from the Mayor & City Council.  There is no evidence that the BCPD is in any way under the control of the Governor, State Legislature, or any other State agency in its day-to-day functioning, and in fact, the BCPD is funded by the Mayor & City Council of Baltimore, and not by the State of Maryland.

## FACTUAL BACKGROUND

**I.     THE DEFENDANTS' ILLEGAL STOP OF PLAINTIFF, AS WELL AS THE FABRICATION AND SUPPRESSION OF EVIDENCE, IS PART OF A WIDESPREAD AND WELL-KNOWN BCPD PATTERN OR PRACTICE OF ILLEGAL CONDUCT SPANNING DECADES**

15. The BCPD has known or should have known for decades that officers given broad authority as part of various "elite" plainclothes units to combat violence, guns, and drugs, often engaged in a pattern or practice of illegal activities such as the ones alleged in this complaint.

8

16. Despite actual or constructive knowledge of this pattern or practice, the BCPD condoned misconduct committed by these units by ignoring widespread abuses.  Rather than discontinuing such plainclothes operations or instituting meaningful reforms and supervision after numerous allegations and scandals, the BCPD merely rebranded these specialized units periodically.  While the names of these units changed throughout the years, their officers' misconduct remained the same.

17. The conduct of the defendant officers was at all times incidental to the performance of the duties that the employer entrusted to said defendants and was within the scope of their employment, and for the benefit of their employers Mayor & City Council of Baltimore, the Baltimore Police Department, and former Commissioner Hamm, Batts, and Bealefeld. Furthermore, the other defendants benefited from the actions of the defendant officers.

18. For many years before the complained of conduct, the BCPD deployed these elite units to investigate and arrest persons suspected of drug distribution and/or of gun violations. These units included the so called "Flex Squads," Special Enforcement Teams (hereinafter "SETS"), and the Violent Crime Impact Section.

19. As suggested by the name "plainclothes," members of these units wore ordinary clothes (such as jeans and t-shirts) and tactical vests while on duty, rather than traditional police uniforms.

20. Plainclothes officers have and continue to be referred to as "knockers" or "jump out boys" throughout Baltimore. They are known for egregious conduct such as driving unmarked vehicles towards groups of people, jumping out, assaulting, and conducting aggressive illegal searches of anyone within the vicinity.

21. In January 2006, the Baltimore Sun published an article regarding the misconduct within the BCPD Flex Squads.

22. The Baltimore Sun Article was titled, "Questions Raised for Years about City Flex Squad" and noted that:

   - The BCPD employed "flex squads" in all its districts, which, unlike normal officers, had enhanced freedom to "chase down suspected criminals in neighborhoods dominated by drug dealing and violence."

   - "Defense attorneys, prosecutors and community members say they have heard for years about allegations of misconduct that included planted drugs and troublesome practices about how suspects were treated and charged."

   - The Baltimore Sun's "review of court and other records show[ed] that allegations of wrongdoing have dogged some of the squad's members for years."

   - "In a warrant police used to search the flex squads office last month, investigators noted that previous allegations against 'certain officers have been made as to the planting of controlled dangerous substances on citizens in an effort to knowingly make false arrests.'"

23. BCPD officers working as part of flex squads repeatedly engaged in a pattern of misconduct, including numerous instances prior to the complained of incident.

24. For instance, in 2005, Officers William King and Antonio Murray were charged, and later received 100-year federal sentences for robbing drug dealers, drug trafficking, and gun violations after terrorizing Baltimore citizens as plainclothes officers for over a decade.

25. Additionally, Officer Jemini Jones, a member of the Southwest District's Flex Squad, was accused of raping women while on duty on two separate occasions, once in October 2005 and the other in December 2005.

26. While investigating the December 2005 incident involving Officer Jones, Baltimore drug detectives found "that 'flex squads' officers had been stealing drugs and cellphones from people they had arrested, planting evidence, and making false arrests."

27. Police commanders disbanded the Southwest District's flex squad as a result of the allegations against Jones and the other flex squad officers involved.  The BCPD also announced that it would conduct an internal affairs investigation into "every officer in those units."

28. The BCPD was thus on notice, from at least 2005, of the potential for abuse associated with officers who had the wide latitude to act in a manner similar to that of the flex squad officers.

29. In 2010, the BCPD disbanded another plainclothes unit in Northwest District after discovering a supervisor and one of the officers had been using a stolen license plate on an unmarked car.

30. At the same time the allegations first surfaced regarding the flex squads, the Baltimore Sun reported on similar allegations levied against the Special Enforcement Teams, whose "officers [were] accused of lying in charging documents, most of which involve drug arrests that result from car stops."

31. SET members normally worked in plainclothes, like the flex squads, and patrolled the streets in unmarked cars.  The flex squads were managed by each of the nine district commanders, whereas the SETS were managed directly by the BCPD's Chief of Patrol.

32. A former SET officer has explained in a recent article that he and his fellow unit members were "encouraged to make as many arrests as possible" during their overnight shifts.  He also claimed they "stopped about every adult they saw on the street to check their names for open warrants and conducted car stops with the intended goal of searching vehicles." (apparently without probable cause)

33. In September 2006, NBC News referred to a release from the Associated Press titled "Baltimore police unit reassigned amid scandal."

34. The aforementioned article noted that the BCPD confirmed its investigation of SET which was described as a "discretionary unit" operating in the Southeastern District.  It reported that "dozens of criminal cases have been thrown out because of misconduct allegations against the specialized unit, allegations that have led the department to reassign all seven of the unit's members to desk jobs."

35. Despite being aware of the rampant misconduct that plagued the flex squads and SETs, in July 2007, the BCPD formed a new elite, plainclothes unit known as the Violent Crimes Impact Sections (VCIS) to focus on "bad guys with guns." (a new name for the same unconstitutionally condoned conduct)

36. Like their predecessors, the VCIS members operated with little supervision and unsurprisingly engaged in widespread abuse.  In short order, the VCIS became the source of a disproportionate number of citizen's complaints and came under criticism from members of the community and the Baltimore City Council.  Once again, this was unacted upon.

37. In September 2014, the Baltimore Sun published an investigative piece titled "Undue Force" which noted:

- Many lawsuits in the City "stemmed from the now disbarred VCIS, which used plainclothes officers to target high-crime impact."

- In 2009, a plainclothes VCIS member beat up a Baltimore citizen, Jerriel Lyles, in an East Baltimore carry-out restaurant.  Mr. Lyles subsequently settled his excessive force case with the City for $200,000.00.

- "Officers in the unit were accused by prosecutors of lying on a search warrant and working to protect a drug dealer in order to make arrests."

- Three other VCIS members were charged in 2010 with kidnapping two city teens and leaving one in Howard County State Park without shoes, socks, or his cellphone.  The two separate kidnappings occurred in May 2009.

38. In March 2009, Officer Jemell Rayam, who subsequently worked as a part of the GTTF, worked as a part of VCIS and fatally shot Shawn Cannady.  It was Officer Rayam's third shooting in a span of 20 months.   The City later settled a lawsuit dealing with the aforementioned incident.

39. In June 2009, Officer Rayam, while driving an unmarked vehicle with two other plainclothes officers, pulled over a driver for allegedly not wearing a seatbelt.  During the subsequent stop, Officer Rayam and the other officers put the driver in flex cuffs and stole the $11,000.00 they found in the car.

40. Around the same time, Officer Rayam was awarded the Citation of Valor and the Silver Star for his work in the VCID.

41. Additionally, Fabien Laronde, a VCIS officer was the subject of numerous complaints regarding planting evidence, using excessive force in 2006, and conducting an illegal strip search of a man in a shopping center parking lot in 2009.

42. The misconduct in the VCIS was so widespread that in 2013, the FBI initiated an investigation which determined that multiple unit members had falsified reports to further their cases.   Several officers were suspended as a result of the investigation, another received six (6) months of home detention, and yet another pled guilty to federal gun and drug charges and was sentenced to eight (8) years.   In another incident involving a wiretapped call, the officer who pled guilty discussed planting a gun in an unlicensed cab, pulling the cab driver over, and then arresting the cab driver on a gun violation.

43. Rather than disbanding the VCIS, the BCPD merely "rebranded" it the "Special Enforcement Section (hereinafter "SES") in December 2012, retaining many of the guilty VCIS officers.

44. In addition to the illegal searches and seizures by the various plainclothes units, the BCPD maintained a pattern and practice of conducting illegal stops and seizures, including but not limited to the conduct that formed the basis of the ACLU's June 2006 lawsuit.

45. In addition to the fabrication and suppression of evidence by the various plainclothes units, the BCPD maintained a pattern and practice of fabricating and suppressing evidence as reflected in numerous complaints, civil actions, settlements, and judgments including, but not limited, to numerous individuals who have been subsequently exonerated for wrongful convictions, including Walter Lomax, Michael Austin, Wendell Griffin, James Owens, Sabein Burgess, Antione Pettiford, Tyrone Jones, Malcolm Bryant, and Jerome Johnson.

46. In sum, for many years before the defendant officers illegally stopped Mr. Redd, the BCPD knew of the illegal acts regularly committed by its police units.

47. The illegal conduct of the BCPD's flex squads, SETs, the VCIS, and other plainclothes units were no secret to the BCPD or its policy makers.   Therefore, the BCPD had repeated

notice of the problems that could and did arise with utilizing units of plainclothes police officers, with blemish past conduct, driving unmarked vehicles, and who had a wide latitude to combat drug and gun related offenses years before the officer Defendants' illegal stop of Mr. Redd.  Given the knowledge that the BCPD had prior to the events at issue in the instant Complaint, a reasonable police department would have taken sufficient steps to ensure that those events would not occur.  Unfortunately for the victims, the BCPD failed to take such steps, thus allowing Defendant Officers to illegally stop, search, seize, fabricate evidence, and suppress exculpatory evidence with respect to Plaintiff and others while acting as members of the flex squads, SETs, VCIS, and other plainclothes units which they had been openly doing for years.

## II.   BCPD KNOWINGLY ALLOWED OFFICER DEFENDANTS TO CONTINUE ELITE SQUADS SUCH AS FLEX SQUAD'S, SETS' AND VCIS' PATTERN OF ILLEGAL CONDUCT

48. Much like members of the aforementioned police units, Defendant Officer were members of elite plainclothes units within the BCPD with broad authority to roam the city ostensibly looking for guns and drugs.

49. Although BCPD conducted internal investigations into the former elite units and thus had ample opportunity to correct their illegal behavior, it failed to provide the necessary oversight, discipline, or training to ensure that the officer defendants did not engage in the same pattern of misconduct.

50. The BCPD rebranded the previous elite squads and formed the GTTF in May 2007 around the same time it formed the VCIS with the stated goal of tracking and curbing illegal gun sales and activities.

51. At the time Officer Rayam was transferred to the GTTF, the BCPD was well aware that he had scored a 99% chance of deception regarding questions on a BCPD administered polygraph examination about a June 2009 vehicle stop in which he stole $11,000.00 (previously described), yet he kept his job and was awarded his promotion to the GTTF.

52. The BCPD did nothing to investigate or address this misconduct.

53. Additionally, over the course of the GTTF's existence, the BCPD and local authorities were aware of GTTF misconduct and did nothing to stop or correct the misconduct.

54. In a 2014 case involving GTTF Officer Wayne Jenkins, an Assistant State's Attorney Molly Webb notified the defense counsel in a criminal prosecution that video camera footage of the alleged incident directly contradicted the sworn statements of probable cause submitted by the GTTF officers.   The case was dismissed, and inconsistencies were reported to BCPD's internal affairs division.

55. Upon information and belief, no investigation was conducted, and no disciplinary actions were taken against any officers concerning their alleged misconduct.   In fact, Wayne Jenkins was subsequently promoted to officer in charge of the GTTF in 2016.

56. Instances involving the defendant officers and several indictments against GTTF officers since 2017 demonstrate this failure.

57. On February 23, 2017, a number of GTTF officers were indicted for various RICO offenses.

58. The RICO indictment revealed that GTTF officers engaged in, among other things, the following overt acts:

- Conducting traffic stops of vehicles and stealing money, property, and narcotics from the vehicle occupants; and

16

- Preparing false and fraudulent official indictment and arrest reports, reports of property seized from arrestees, and charging documents concealing the fact that the GTTF officers stole money, property, and narcotics from individuals.

59. In the above referenced matter, GTTF officers testified that Defendant Suiter used to steal money from innocent Baltimore City citizens with other members of the GTTF – namely Sergeant Wayne Jenkins.

60. Defendant Suiter committed suicide on November 15, 2017, the day before he was expected to testify against other members of the GTTF misconduct in which he was also involved.

61. Following the indictments of the GTTF officers, at a press conference, then police commissioner said: "The culture around here contributes to it, and should someone have known about it?  Absolutely they should have known."

### III.    BCPD ENTERED INTO A CONSENT DECREE IN WHICH IT ADMITTED TO A PATTERN AND PRACTICE OF CONDUCT SUBSTANTIALLY SIMILAR TO THAT AT ISSUE HERE AND BASED IN PART ON ACTIVITIES THAT OCCURRED PRIOR THERETO

62. Following the April 2015 death of Freddie Gray while in police custody, then Baltimore Mayor Stephanie Rawlings-Blake asked the United States Department of Justice Civil Rights Division to conduct a pattern and practice investigation into the BCPD's policies.

63. The Justice Department issued an investigative report on August 10, 2016.  That report included the following findings:

- It announced that it "reviewed hundreds of thousands of pages of documents including all relevant policies and training manuals used by the BCPD since 2010, BCPD's database of internal affairs files; a random sample of about 800 case files

on non-friendly force incidents; files on all deadly force incidents since 2010 and other data;

- The BCPD engaged in a "pattern or practice" of conduct that violates the United States Constitution and federal law, including stops, searches and arrests without the reasonable suspicion or probable cause required under the Fourth Amendment to the Unites States Constitution;

- That the BCPD disproportionately stops African Americans standing, walking, or driving on Baltimore streets.  Even though only 63% of Baltimore City's population is African American, 84% of Baltimore City Police Department's officer's stops were of African Americans.

- The forgoing pattern or practice is rooted in BCPD's deficient supervision and oversight of office activity and resulted in part from BCPD's Zero tolerance enforcement strategy, dating back to the early 2000's.

- The BCPD failed to act against officers with a long history of misconduct that is well known to the department.  For example, one officer currently employed by the BCPD had received approximately 125 complaints from complainants within the department and from the community since 2010, and many of these complaints allege serious misconduct.  However, the DOJ found the BCPD had sustained only one complaint against the officer for minor misconduct.

- In June 2006, the ACLU of Maryland sued the BCPD regarding its illegal arrests of thousands of Baltimore residents.  In 2010, that case settled with the BCPD agreeing to change its policies and procedures and submit to an independent auditor

to evaluate its progress towards adoptions of stop and frisk practices consistent with the United States Constitution.

- The final report of the auditor from 2014 noted that there were no systemic improvements in reporting for those stop and frisk offenses during the monitoring period; and

- Various policies that predate the events at issue in this matter demonstrated that the BCPD failed to adequately equip its officers to police effectively and constitutionally.

64. The DOJ report specifically highlighted the illegal conduct of the various plainclothes units (recognizing that as outlines above, "the names and organizations of the plainclothes units have changed multiple times over the years").  It noted that a "disproportionate share of complaints" identified plainclothes officers as "particularly aggressive and unrestrained in their practice of stopping individuals without cause and performing public, humiliating searches."

65. On January 12, 2017, the United States Department of Justice Civil Rights Division filed a complaint in the United States District Court for the District of Maryland against the BCPD.  The complaint alleged that:

- In the late 1990's BCPD adopted zero tolerance policing strategies that prioritized officers making large number of stops, searches, and arrests for misdemeanor offenses without ensuring robust oversight to hold officers accountable for misconduct and protect the constitutional rights of Baltimore City residents; and

- Based on data from 2010 – 2015, BCPD engaged in a pattern or practice of conduct that violated the United States Constitution and federal laws.  Those violations

included unconstitutional stops which ran afoul of the rights guaranteed to Baltimore's citizens by the Fourth and Fourteenth Amendments to the Constitution of the United States; and

- BCPD's violations of the Constitution and federal law are driven by the BCPD's systemic deficiencies in policies, training, supervision, and accountability structures. BCPD has been aware of these structural challenges for many years but has not taken the adequate steps to comply with the Constitution or federal law.

66. The same day, the United States and the BCPD jointly filed a motion asking the court to approve a 227-page consent decree. That decree provided in relevant part that:

- BCPD will provide its officers with training on stops, searches, and seizures.

- BCPD will ensure that a supervising officer reviews all documentation relating to stops, searches, seizures, arrests, for completeness and adherence to the law and BCPD policy.

- BCPD will audit the aforementioned supervisory report.

67. On April 7, 2017, the court granted that motion, entered a slightly modified version of the consent decree, and stated that it will retain jurisdiction over the decree until it is terminated. As of the filing of this complaint the decree remains in place.

## IV.    THE POLICIES, CUSTOMS, AND USAGE OF THE BCPD

68. BCPD policy makers, aware since at least the early 2000's of numerous instances of misconduct committed by plainclothes officers and units similar to that at issue here, failed to adequately supervise the plainclothes units, thus allowing the unconstitutional conduct described herein to occur.

69. BCPD supervisors condoned the widespread misconduct within plainclothes units. Despite knowledge that plainclothes units were the source of a disproportionate share of complaints against the BCPD for many years, and at the center of numerous allegations and cases of misconduct, the BCPD continued to permit plainclothes officers to roam the streets with high levels of discretion and little supervision. Even after several public scandals highlighting the abuses endemic to all of the aforementioned plain clothes police squads, the BCPD did not institute any meaningful oversight of these specialized units. The BCPD's continued inaction in the face of the pervasive constitutional violations evidences its deliberate indifference to the rights of its citizens.

70. Despite knowledge that Defendant Officers engaged in repeated acts of misconduct, the BCPD did not punish the officers but rewarded them by promoting them and allowing them to continue policing in these "elite" units.

71. The frequency and duration of the misconduct involving plainclothes units demonstrates that the misconduct was pervasive within the BCPD at the time of the events at issue. The widespread reporting of misconduct as described in this Complaint was committed with the knowledge of the BCPD supervisors who demonstrated a deliberate indifference to the illegal conduct.

72. Upon information and belief, plainclothes officers were encouraged and pressured by BCPD supervisors to recover as many guns and make as many arrests as possible, and plainclothes officers were promoted in large part based on their arrest statistics, without regard for the methods these officers used to recover those guns and make those arrests.

73. Plainclothes officers were praised by the BCPD supervisors notwithstanding numerous allegations of misconduct. For example, as previously mentioned, GTTF Officer Rayam

received awards and continued to be promoted to elite squads despite his history of gross misconduct. Additionally, in a BCPD newsletter, Lieutenant Christopher O'Ree wrote "I am extremely proud to showcase the work of Sergeant Wayne Jenkins and [his team]" (aka the Gun Trace Task Force)… "their relentless pursuit to make our streets safer by removing guns and arresting the right people for the right reasons has made our city safer. I couldn't be more proud of the strong work of his team … this team of dedicated detectives has a work ethic beyond reproach." (Sgt. Jenkins has subsequently been convicted and sentenced).

74. The unconstitutional conduct at issue in this case including, but not limited to, the illegal stopping, detaining, searching, and seizing of persons; the permitted use of fabricated evidence to support unconstitutional stops and seizures, and suppressing exculpatory and or impeachment evidence was sufficiently pervasive within the BCPD that it assumed the quality of a custom, usage, pattern and practice by the BCPD.

75. With respect to stops and searches, the BCPD supervisors conducted minimal substantive review of plainclothes officers' justifications for their actions.

76. The BCPD had actual or constructive knowledge of the conduct and actions as identified above and either intended that the "custom or usage" pattern and practice continue or was deliberately indifferent to stopping or correcting the conduct, which caused the plaintiff's injuries.

77. The BCPD policymakers, aware of specific instances of police misconduct similar to the issue here prior to 2005 and armed with actual knowledge of officers' misconduct failed to adequately discipline their officers thus allowing for the unconstitutional conduct described herein to continue.

78. Despite rampant misconduct within the plainclothes units, the BCPD did not supervise or discipline its officers.

79. At all times relevant hereto, the BCPD failed to institute adequate systems and procedures to investigate and punish officers who engaged in the misconduct.  For instance, prior to the events at issue, the BCPD's Internal Affairs Division did not investigate or track complaints made against its officers through civil lawsuits, even those that resulted in judgments against the officers.

80. This failure, along with many others, allowed officers like Defendant Officers to engage in repeated misconduct without consequence.

81. As detailed in the DOJ Report, the BCPD's disciplinary system was deficient, among other things, in the following respects:

- Discouraged individuals from filing complaints.

- Tolerated excessive and chronic delays in resolving disciplinary complaints.

- Supervisors misclassified serious complaints as minor ones so that they could be resolved at the command level without IAD (Internal Affairs Division) involvement.

- Supervisors summarily closed complaints without investigation.

- Failed to investigate complaints in a timely manner.

- Failed to consider evidence that contradicted explanations provided by officers accused of misconduct.

- Failed to probe beyond reports that the accused officer already provided.

- Provided officers with a detailed notice of the alleged misconduct at the onset of an investigation compromising investigation and creating the possibility that the complaining party could be targeted for retaliation and intimidation.

- Used a trial board system characterized best by delays and deficiencies.

- Failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct.

- Supervisors failed to identify deficiencies or questionable findings in investigations and did not take steps to ensure that investigators did not have conflicts of interest with the officers they were investigating.

82. Additionally, the BCPD's IAD was underprepared and overburdened during this time period.  IAD detectives, as detailed in the independent report, lacked key training on how to investigate officers suspected of misconduct.  Upon information and belief, at all times relevant hereto, IAD investigators, were also assigned on average between 35-50 cases to investigate (far above the national average) and were frequently ordered to patrol the streets, further limiting their ability to investigate misconduct. At times, IAD officers were detailed to patrol the streets with the same officers they were investigating.

83. Retired Police Sergeant Chad Ellis who worked in the IAD during the time of the 2009 investigation of Officer Rayam regarding his theft in another matter, explained the IAD was ill prepared and inexperienced in their area of alleged expertise – from the top to the bottom at that point.

84. A police spokesperson likewise acknowledged that in 2009 the BCPD did not have an adequate intervention system in place at that time for flagging problem officers.

85. In 2013, then Police Commissioner Anthony Batts acknowledged in the BCPD's Strategic Plan for Improvement that "discipline has not always been a priority for the BCPD." He went on to explain that for "many years" the "internal affairs system accrued numerous deficiencies" including "a backlog of disciplinary verdicts that were never carried out and a substantial case backlog." Commissioner Batts noted that cases could take up to 3 years to resolve.

86. The police misconduct was sufficiently widespread and pervasive within the BCPD that it assumed the quality of a "custom or usage" or pattern and practice of the BCPD.

87. The BCPD had actual or constructive knowledge of the same as identified herein and either intended that the custom or usage or pattern and practice continue or was deliberately indifferent to stopping or correcting the same, which caused the Plaintiff's injuries.

88. The BCPD was aware of the potential for abuse among elite units like the GTTF since at least the early 2000's when the Baltimore Sun began reporting on the flex squad and SET misconduct, and despite having final authority to establish and implement policies, the BCPD permitted and condoned the GTTF and other plainclothes units unconstitutional conduct alleged herein and failed to establish and implement proper training policies.

89. For instance, as described in the DOJ Report, a BCPD stop and frisk training lesson from 2009 incorrectly stated the relevant standard for searches and seizures. The training indicates that "'Investigative contacts of citizens by members of this agency will be conducted with articulable reason.' 'Articulable reason' misstates the *Terry* standard requiring reasonable suspicion based on specific and articulable facts. The lesson plan later instructs that the member 'must be able to articulate reasonable suspicion or belief a crime has been or will be committed to perform a stop and frisk.' This similarly misstates the

relevant law, as it indicates that the same standard of suspicion is required for both an investigatory stop and a subsequent frisk – contrary to the requirement that an officer possess separate reasonable suspicion that an individual is armed and dangerous prior to initiating a frisk."

90. Additionally, at all times relevant hereto, the BCPD lacked adequate staffing to conduct trainings of its officers, facilities for training, and mechanisms to ensure that officers had received and understood the supposedly mandatory training.

91. In 2015, the former director of the BCPD's training and academy released a document outlining the numerous deficiencies in training and highlighted the department's "internal culture of placing training second."

92. The Baltimore Police Department has had repeated notice through, *inter alia*, convictions of their police officers, complaints and suits lodged against their police officers, public reporting, failed polygraph tests, and notifications from State prosecutors that the BCPD's plainclothes police officers engaged in a widespread pattern of flagrant unconstitutional violations. Its failure to take any action to stop such conduct constituted the BCPD's condoning the pattern and practice.

93. In sum the BCPD's policies, customs, and practices of promoting, facilitating, or condoning improper, illegal and unconstitutional policing, and its policy, custom and practice of failing to adequately supervise, discipline, and train BCPD plainclothes units was reflected in the numerous prior allegations and cases of misconduct involving plainclothes police officers. The long history of misconduct committed by plainclothes units was actually or constructively known to BCPD supervisors and/or policymakers, who failed to supervise, discipline, or train in response to such notice.  The continued adherence

to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of individuals such as Plaintiff Garfield Redd.

## V.     THE UNCONSTITUTIONAL STOP AT ISSUE AND SUBSEQUENT PROSECTION.

94. On or about October 22, 2006, Mr. Garfield Redd was illegally stopped by Defendant Officers Suiter, Ivery, Vargas, and Glanville, who were plainclothes officers and members of an elite squad, when in fact there was no probable cause to do so.

95. Plaintiff was falsely charged with numerous gun related charges.  These false charges stemmed from an incident in which he allegedly possessed a firearm when in fact the firearm in question was planted by Defendant Officers.

96. Mr. Redd was charged with several firearm related offenses in the Circuit Court for Baltimore City, Case No.'s 107029035 and 807012027.

97. Those charges were eventually *nol prossed* on 11/13/2007; however, Mr. Redd was sentenced to 20-years on a federal parole retake due to the false charges.  Mr. Redd's expected release date is 09/23/2025.

98. Defendant Commissioners were well aware of the unlawful conduct committed by the defendant officers.  At no time did the defendant commissioners make any attempt to undo the injustice committed by Defendants.

99. Mr. Redd's arrest was without legal justification or probable cause.

100. Defendant Commissioner Hamm exercised substantial control over the policies and practices that governed the actions of individual officers in the BCPD, including Defendant Officers and their superiors.

27

101. In exercising such control, Defendant Commissioner Hamm, created by implication or express instructions, a policy, practice, or custom within the BCPD which not only promoted but condoned said violations of the Constitutional rights of citizens by allowing illegal arrests and the bringing of false charges against law abiding citizens.  The failure to train and to institute where necessary to correct, practices and policies, amounted to a deliberate indifference to the Constitutional rights of persons with whom the police came into contact.

## COUNT I – FALSE ARREST
**(Officers Sean M. Suiter, Kenneth E. Ivery, Pedro A. Vargas, and James S. Glanville)**

102. Plaintiff incorporates herein by reference all preceding paragraphs as if fully stated herein.

103. Defendants had no reasonable suspicion based on specific and articulable facts to believe Mr. Redd had engaged in any crime, but nevertheless arrested Mr. Redd without a warrant, without legal justification, and without probable cause to support a lawful arrest.

104. Defendants conduct demonstrated ill will, improper motivation, and actual malice.

105. As a result of Defendants' actions, Mr. Redd suffered damages including, but not limited to, denial of his freedom that he would have otherwise spent freely without the trauma related to a criminal prosecution, incarceration and probation, emotional trauma, humiliation, distress, and was prevented from engaging in his usual employment duties, activities, and pursuits, and will be otherwise injured and damaged, both past, present, and in the future.

**WHEREFORE,** Plaintiff brings this action against the defendants, Paul C. Siegrist, Personal Representative of The Estate of Sean M. Suiter, Sergeant Ivery, Sergeant Glanville,, Officer Vargas, Baltimore City Police Department, Former Police Commissioner Anthony W.

Batts, Former Police Commissioner Frederick H. Bealefeld, III, Former Police Commissioner Leonard Hamm, and Mayor & City Council of Baltimore, individually and jointly, and claims compensatory damages in the amount of $125,000,000.00 (125 Million Dollars), and punitive damages in the amount of $5,000,000.00 (5 Million Dollars).

### COUNT II – FALSE IMPRISONMENT
**(Officers Sean M. Suiter, Kenneth E. Ivery, Pedro A. Vargas, and James S. Glanville)**

106.  Plaintiff incorporates the preceding paragraphs as if fully stated herein.

107.  The actions of Defendant Officers caused Mr. Redd to be unlawfully deprived of his personal liberty, freedom, and property without his consent and without justification by the malicious, intentional, and wanton acts of Defendants.

108.  As a result of the unlawful conduct described herein, Mr. Redd was detained against his will for an extended period of time, and he experienced pain, suffering, humiliation, inconvenience, and embarrassment for the totality of the events he was forced to endure.

109.  As a result of Defendants' actions, Mr. Redd suffered damages including denial of his freedom that he would have otherwise spent freely, without the trauma related to a criminal prosecution, incarceration and probation, emotional trauma, humiliation distress, and was prevented from engaging in his usual employment, duties, activities, and pursuits; and will be otherwise injured and damaged, both past, present, and in the future.

110.  The defendants' actions demonstrated ill will, improper motivation, evil purpose, and/or actual malice.

**WHEREFORE,** Plaintiff brings this action against the defendants, Paul C. Siegrist, Personal Representative of The Estate of Sean M. Suiter, Sergeant Ivery, Sergeant Glanville,, Officer Vargas, Baltimore City Police Department, Former Police Commissioner Anthony W.

Batts, Former Police Commissioner Frederick H. Bealefeld, III, Former Police Commissioner Leonard Hamm, and Mayor & City Council of Baltimore, individually and jointly, and claims compensatory damages in the amount of $125,000,000.00 (125 Million Dollars), and punitive damages in the amount of $5,000,000.00 (5 Million Dollars).

### COUNT III – MALICIOUS PROSECUTION
### (Officers Sean M. Suiter, Kenneth E. Ivery, Pedro A. Vargas, and James S. Glanville)

111. Plaintiff incorporates herein by reference the preceeding paragraphs as if fully stated herein.

112. Defendant officers instituted criminal proceedings against Mr. Redd without probable cause.

113. Defendant officers instituted criminal proceedings against Mr. Redd with malice and with a motive other than bringing an offender (Mr. Redd) to justice.

114. Ultimately, all of Mr. Redd's State charges *nol prossed.*

115. As a result of Defendants' actions, Mr. Redd suffered damages including, but not limited to, denial of his freedom that he would have otherwise spent freely without the trauma related to a criminal prosecution, incarceration, and probation, emotional trauma, humiliation, distress, and was prevented from engaging in his usual employment, duties, activities, and pursuits; and will be otherwise injured and damaged, both past, present, and in the future.

**WHEREFORE,** Plaintiff brings this action against the defendants, Paul C. Siegrist, Personal Representative of The Estate of Sean M. Suiter, Sergeant Ivery, Sergeant Glanville,, Officer Vargas, Baltimore City Police Department, Former Police Commissioner Anthony W. Batts, Former Police Commissioner Frederick H. Bealefeld, III, Former Police Commissioner Leonard Hamm, and Mayor & City Council of Baltimore, individually and jointly, and claims

compensatory damages in the amount of $125,000,000.00 (125 Million Dollars), and punitive damages in the amount of $5,000,000.00 (5 Million Dollars).

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Officers Sean M. Suiter, Kenneth E. Ivery, Pedro A. Vargas, and James S. Glanville)

116.  Plaintiff incorporates herein by reference the preceding paragraphs as if fully stated herein.

117.  Defendant Officers intentionally harassed Mr. Redd, by stopping him without cause, and physically restricting his movement.

118.  Defendant Officers planted a gun, arrested, and falsely charged Mr. Redd with crimes.

119.  Defendant Officers conduct was intentional, malicious, extreme, outrageous, and caused the plaintiff severe emotional distress as described herein.

120.  This conduct was particularly shocking to the plaintiff, who had not engaged in any criminal conduct, but was forced into a criminal prosecution, confinement, and incarceration.

121.  As a result of Defendants' actions, Mr. Redd suffered damages including, but not limited to, denial of his freedom that he would have otherwise spent freely without the trauma related to a criminal prosecution, incarceration, and probation, emotional trauma, humiliation, distress, and was prevented from engaging in his usual employment, duties, activities, and pursuits; and will be otherwise injured and damaged, both past, present, and in the future.

**WHEREFORE,** Plaintiff brings this action against the defendants, Paul C. Siegrist, Personal Representative of The Estate of Sean M. Suiter, Sergeant Ivery, Sergeant Glanville,, Officer Vargas, Baltimore City Police Department, Former Police Commissioner Anthony W. Batts, Former Police Commissioner Frederick H. Bealefeld, III, Former Police Commissioner Leonard Hamm, and Mayor & City Council of Baltimore, individually and jointly, and claims

compensatory damages in the amount of $125,000,000.00 (125 Million Dollars), and punitive damages in the amount of $5,000,000.00 (5 Million Dollars).

**COUNT V – VIOLATION OF ARTICLE 24 AND ARTICLE 26 OF THE MARYLAND DECLARATION OF RIGHTS**
**(Officers Sean M. Suiter, Kenneth E. Ivery, Pedro A. Vargas, and James S. Glanville)**

122. Plaintiff incorporates the preceding paragraphs as if fully stated herein.

123. Article 24 of the Maryland Declaration of Rights protects the same freedoms guaranteed by the Fourth Amendment of the Unites States Constitution.

124. Article 24 provides that no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land; Article 26 provides that all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or in the person in special, are illegal, and ought not to be granted.

125. Defendants had no recognized justification for their warrantless search and seizure of Plaintiff Redd.  Defendant Officers' conduct was objectively unreasonable under *Graham v. Connor,* 490, U.S. 380 (1989).  Thus, Defendant Officers' actions violated Plaintiff's rights guaranteed by Article 24 and Article 26 to be free from unreasonable searches and seizures.

126. As a result of Defendants actions, Mr. Redd suffered damages including, denial of his freedom that he would have otherwise spent freely without the trauma related to a criminal

prosecution, incarceration and probation, emotional trauma, humiliation, distress, and was prevented from engaging in his usual employment, duties, activities and pursuits; and will be otherwise injured and damaged, both past, present, and in the future.

**WHEREFORE,** Plaintiff brings this action against the defendants, Paul C. Siegrist, Personal Representative of The Estate of Sean M. Suiter, Sergeant Ivery, Sergeant Glanville,, Officer Vargas, Baltimore City Police Department, Former Police Commissioner Anthony W. Batts, Former Police Commissioner Frederick H. Bealefeld, III, Former Police Commissioner Leonard Hamm, and Mayor & City Council of Baltimore, individually and jointly, and claims compensatory damages in the amount of $125,000,000.00 (125 Million Dollars), and punitive damages in the amount of $5,000,000.00 (5 Million Dollars).

### COUNT VI – PLAINTIFF'S § 1983 CLAIM FOR VIOLATION OF PLAINTIFF'S FOURTH AND FOURTEENTH AMENDMENT RIGHTS AND PRIVILEGES (Officers Sean M. Suiter, Kenneth E. Ivery, Pedro A. Vargas, and James S. Glanville)

127.   Plaintiff incorporates herein the preceding paragraphs as if fully stated herein.

128.   That as a result of the actions of the defendants acting under color of law, the plaintiff was deprived of various rights and privileges guaranteed to him by the United States Constitution and the laws of the land including, but not limited to, the Plaintiff's rights under the Fourth and Fourteenth Amendments of the U.S. Constitution as their actions constituted an illegal search and seizure, an illegal use of prosecution and detention, as well as an unreasonable and excessive use of force.  Furthermore, the defendants' actions resulted in the deprivation of Plaintiff's life, liberty, and property without due process of law.

129.   As a result of Defendants' actions, Mr. Redd suffered damages including, denial of his freedom that he would have otherwise spent freely without the trauma related to a criminal

prosecution, incarceration, and probation, emotional trauma, humiliation, distress, and was prevented from engaging in his usual employment, duties, activities, and pursuits; and will be otherwise injured and damaged, both past, present, and in the future.

**WHEREFORE,** Plaintiff brings this action against the defendants, Paul C. Siegrist, Personal Representative of The Estate of Sean M. Suiter, Sergeant Ivery, Sergeant Glanville,, Officer Vargas, Baltimore City Police Department, Former Police Commissioner Anthony W. Batts, Former Police Commissioner Frederick H. Bealefeld, III, Former Police Commissioner Leonard Hamm, and Mayor & City Council of Baltimore, individually and jointly, and claims compensatory damages in the amount of $125,000,000.00 (125 Million Dollars), and punitive damages in the amount of $5,000,000.00 (5 Million Dollars).

### COUNT VII – PLAINTIFF'S § 1983 CLAIM FOR NEGLIGENT SUPERVISION, TRAINING, RETENTION AND CUSTOM OR POLICY OF DELIBERATE INDIFFERENCE
### (Former Commissioner Anthony Batts, Former Commissioner Bealefeld, Former Commissioner Hamm, Baltimore City Police Department, and Mayor & City Council of Baltimore City)

130.  Plaintiff incorporates herein by reference the preceding paragraphs as if fully stated herein.

131.  At all times relevant to this Complaint, Defendant Former Commissioner Leonard Hamm, Defendant Former Commissioner Batts, and Defendant Former Commissioner Bealefeld had a duty, recognized by the Baltimore City Police Department General Orders and Maryland State Statute to supervise, properly train, monitor, and discipline Defendant Officers to the extent required for their improper actions in order to protect citizens such as Mr. Redd against depravation of his Constitutional rights.

132.  That said Commissioners showed a deliberate indifference to the civil rights of Mr. Redd and others, despite having specific knowledge of citizens' complaints against Defendant Officers and other BCPD Officers, Hamm, Batts, and Bealefeld failed to train, supervise,

monitor, and fire Defendant Police Officers for their roles in previous instances of malfeasance.

133. As a direct result of said Defendant Commissioners' failure to train, monitor, supervise, and/or discipline Defendant Officers, the named Defendant Officers, continued their pattern of illegal searches, seizures, arrests, and falsely charging various individuals including Plaintiff Redd.

134. As a direct result of Defendant Commissioner Hamm's, Batts', and Bealefeld's breach of duty, the named Defendant Officers victimized Mr. Redd on October 18, 2015, using similar tactics as those complained of by other Baltimore City residents.  These acts included illegal stops, illegal traffic stops, illegal searches, seizures, arrests, and false charges.  These actions as well as the actions in the present case were the direct result of the former Commissioners Hamm's, Batt's, and Bealefeld's failure to train, supervise, and discipline the said Defendant Officers.

135. Defendant Commissioners Hamm, Batts, and Bealefeld, and the Mayor & City Council of Baltimore were clearly aware or should have been aware that Defendant Officers were complicit in an illegal custom/practice of the Baltimore City Police Department's elite squads and the City of Baltimore.

136. As a direct result of Defendant Commissioner Hamm's, Batts' and Bealefeld's failures, the Baltimore City Police Department's custom of not screening new hires, training, monitoring, supervising, failing to fire Defendant Officers and/or failing to implement policies that prohibit the conduct complained of in this suit, despite having specific knowledge of previous instances of constitutional violations to other Baltimore citizens, Mr. Redd suffered Constitutional depravations which were foreseeable and would not have

happened had Defendant Officers been properly trained.  The training provided to said defendant officers was deficient with respect to Defendant Officers' compliance with Maryland law and the United States Constitution.

137.  The unconstitutional actions of Defendant Officers in this case constituted a deliberate indifference to the Constitutional rights of Mr. Redd, and existed as an official policy, as well as constituted a  custom, pattern, and/or practice of Defendants Hamm, Batts, Bealefeld, the Baltimore City Police Department, and Mayor & City Council of Baltimore. Such conduct has resulted in the conviction of the named Defendant Officers and several other officers of the elite squads.

138.  As a result of Defendants' actions, Mr. Redd suffered damages including, but not limited to, a substantial period of incarceration that he would have otherwise spent freely without the life altering experience related to a criminal prosecution, incarceration and probation, emotional trauma, humiliation, distress, and was prevented from engaging in his usual employment, duties, activities, and pursuits; and will be otherwise injured and damaged, both past, present, and in the future.

**WHEREFORE,** Plaintiff brings this action against the defendants, Paul C. Siegrist, Personal Representative of The Estate of Sean M. Suiter, Sergeant Ivery, Sergeant Glanville,, Officer Vargas, Baltimore City Police Department, Former Police Commissioner Anthony W. Batts, Former Police Commissioner Frederick H. Bealefeld, III, Former Police Commissioner Leonard Hamm, and Mayor & City Council of Baltimore, individually and jointly, and claims compensatory damages in the amount of $125,000,000.00 (125 Million Dollars), and punitive damages in the amount of $5,000,000.00 (5 Million Dollars).

Respectfully submitted,


_____/s/_____
A.  Dwight Pettit, Bar ID 01697
Latoya Francis-Williams, Bar ID 29957
Law Offices of A. Dwight Pettit, P.A.
3606 Liberty Heights Avenue
Baltimore, Maryland 21201
(410) 542-5400
adpetit@adwightpettit.com


_____/s/_____
Allan B. Rabineau, Bar ID 01636
401 E. Pratt Street, Suite 2341
Baltimore, Maryland 21202
(410) 837-9150
allanbra@verizon.net


_____/s/_____
Matt R Ballenger, Bar ID 09800
John R. Roche, Bar ID 19730
Ballenger & Roche, LLC
401 E. Pratt Street, Suite 2341
Baltimore, Maryland 21202
(410) 837-9150
mballenger@br-lawyer.com